UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No: 15-CR-00049(MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff(s) | ) | **ABDIRAHMAN DAUD'S** |
| v. | ) | **OBJECTIONS TO PRESENTENCE** |
| | ) | **REPORT AND GUIDELINE** |
| ABDIRAHMAN YASIN DAUD (4), | ) | **CALCULATIONS** |
| | ) | |
| Defendant | ) | |

Abdirahman Daud recognizes that due to the number of defendants involved, the length and nature of the conspiracy in this case, the voluminous materials supplied by the government to the preparer of the Presentence Report ("PSR"), and the lengthy trial record, that writing a summary offense conduct for the PSR is a difficult and complex task. Defendant highlights below some specific factual objections to conduct which is erroneously attributed to Mr. Daud. These objections do not affect the Guideline calculations.

Mr. Daud further objects to the 12 level adjustment in the offense level, and the assigning to Mr. Daud of a Criminal History Category VI, pursuant to U.S.S.G. §3A1.4. These objections are legal in nature and can be resolved by the Court without an evidentiary hearing.

## Offense Conduct

Historical Background – The PSR (¶18) fails to adequately summarize the horrors and suffering of the conflict in Syria as well as the historical grievances of the indigenous population with respect to the intervention of Western powers including the United

1

Kingdom, France, and the United States. Defendant does not refer to these facts and history to justify Abdirahman Daud's planning and attempt to join a foreign terrorist organization. They are relevant, however, in that they contribute to an understanding of his conduct other than a desire to simply engage in grotesque and monstrous acts of violence. The suffering of the Syrian people, following upon the devastation of Iraq and the growth of sectarian conflict in the aftermath of the United States invasion of Iraq in 2003, combined with the division of the region into modern nation states after World War I with the purpose of placing the area's natural resources under the colonial control of European powers, all created fertile ground for the recruitment of young, idealistic Muslim men from around the world by a sophisticated and manipulative terrorist organization such as ISIL.

In addition to glorifying extreme acts of violence in its propaganda videos, ISIL also seeks to project itself as a governing state, providing stability and humanitarian assistance to the population that it controls. ISIL produces extensive propaganda claiming support among the population it governed. Government expert Charles Lister has written and testified that ISIL spends significant resources on providing social services and has assumed authority over electricity, water and gas supplies, local factories, and even bakeries. ISIL has started soup kitchens for the poor, provide free medical care including vaccinations for the poor, and offered construction loans to rebuild houses and buildings. ISIL has repaired electricity lines, roads, and critical infrastructure damaged by war. Mr. Lister has written that ISIL, at least in the short term, appears as a viable alternative to what the local population perceives to be repressive, sectarian, and foreign influenced

governments. All of these efforts have been highlighted by ISIL in the media and propaganda that it produces.

The Government's expert, Charles Lister, testified that a leading Syrian human rights organization, the Syrian Observatory for Human Rights, estimates that 95% of over 110,000 civilian deaths have been caused by the Syrian regime. Hundreds of thousands of Syrian refugees are also fleeing the Assad regime, not ISIL or other jihadi groups. (Lister, 5/12/16, p.215). Allies of the United States, including Saudi Arabia, the Gulf States, and Turkey, have provided significant financial and military aid to Sunni Muslim groups opposed to the Syrian government. These groups, as well as rebel groups funded and armed by the United States, have engaged at times in what is at least a tactical alliance against the Syrian regime with designated terrorist organizations, including the al-Nusra front, the Syrian wing of the Kurdistan Worker's Party ("PKK"), and at times with units of ISIL itself. Notwithstanding the unique, extreme and graphic violence perpetrated by ISIL, many actors in the sectarian conflict in Iraq and the civil war in Syria have committed atrocities and war crimes. The horrors, complexity, and inter-sectional fighting which characterize the war in Syria all contribute to the legitimization and normalization of violence. This history and conflict provides an opening for ideologically rigid and violent organizations such as ISIL to call young men to defend their religious brethren, to reclaim the historical "glory" of past Islamic nations by building a new Caliphate, and to provide these young people with a misdirected sense of meaning and purpose.

Specific Factual Objections – Mr. Daud makes the following comments and objections on the Offense Conduct portion of the Presentence Report as it pertains to his involvement in the conspiracy:

- Daud did not remain at the Dar al-Farooq mosque watching ISIL propaganda videos until the early morning hours during a gathering of young people, including the conspirators in this case, in March of 2014. He was present earlier in the evening. Mr. Daud usually had family expectations and responsibilities during this period of time, such that he did not generally stay out past 10:00 p.m. The trial testimony was that the videos watched that evening were from an internet video channel, "Enter the Truth." They were not produced by ISIL and primarily depicted atrocities by the Syrian regime. (PSR ¶21; Transcript of Yusuf Trial Testimony, 5/13/16, pp.48-50).

- During pre-trial proffer sessions with the Government in February of 2015, cooperating defendant Abdullahi Yusuf stated that Daud was not big on technology and did not view the videos watched by others in the group that was discussing travel to Syria. He did not contradict this statement during his testimony at trial. (Transcript of Yusuf Trial Testimony, 5/16/16, p. 167).

- No witness at trial, or during any proffer statement to the government, stated that Abdirahman Daud ever watched any ISIL propaganda video, with the exception of "Advice to Those Left Behind," during the April 2015 car trip to San Diego. Mr. Daud generally did not watch ISIL propaganda videos in a group with his co-defendants. He admits, however, that was aware that these videos existed and occasionally viewed portions of them. He was not attracted to the depictions of violence in the ISIL videos and did not discuss them in a group with his co-defendants. (PSR, ¶23).

- Mr. Daud did not provide phone numbers or email contacts to Abdullahi Yusuf that Mr. Yusuf could use once he was in Istanbul to obtain assistance from ISIL to enter Syria. During May of 2014, prior to Mr. Yusuf's attempted departure, Mr. Daud did not have any contact information for any person who was located in Turkey or Syria or who had joined ISIL. Mr. Yusuf obtained this contact information from Abdi Nur. Mr. Daud was present when Mr. Nur gave this information to Mr. Yusuf. The testimony of Mr. Yusuf to these facts at trial was contradictory, and either lacked credibility or was indicative of misrecollection with the passage of time. (PSR, ¶31; Transcript of Yusuf Trial Testimony, 5/16/16, pp. 148-154).

- Mr. Daud was not part of any group that watched ISIL propaganda videos during their work breaks at UPS. No witness has ever stated or testified that he was part of such a group. Mr. Daud drove separately to work at UPS from his co-defendants and generally departed immediately for home after work concluded, rather than socializing with his co-workers and co-defendants. Mr. Daud did not meet with his co-conspirators during the summer of 2014 and watch propaganda videos. No witness ever testified that Mr. Daud watched such videos during the summer of 2014. (PSR, ¶43).

- During the period of 2014-2015, Mr. Daud did not have a social media presence, Twitter accounts, or other public electronic communications which supported ISIL, sought to promote ISIL, or which were used to recruit others to join ISIL. As stated elsewhere, Mr. Daud did not generally watch ISIL propaganda videos with groups of people and no witness ever testified that he viewed, or commented on positively, the extreme violence contained in the videos described in Paragraphs #80-#84 of the PSR. (PSR, ¶73-84).

- Abdirahman Daud denies that he ever had the intention of committing violent acts within the United States or of returning to the United States to commit violent acts if ordered to do so by ISIL. The FBI informant recorded Mr. Daud discussing the speculative possibility that after arriving in Syria they could be sent back to commit attacks in the United States, to which Adnan Farah stated, "I'm not coming back here." Mr. Daud agreed, stating, "No, we're not." (PSR, ¶113).

### Participant Summary

Mr. Daud agrees that each defendant is considered an average participant in the offense. As set out in greater detail in his sentencing memorandum addressing 18 USC §3553(a) factors, Mr. Daud contends that all co-defendants who pled guilty, either during the course of establishing a factual basis for their plea agreement or during their trial testimony, admitted that they conspired to travel to Syria to "join, and fight with, ISIL." Under the jury instructions provided at trial for Count I, this would have been a sufficient factual basis to convict each co-defendant of a violation of 18 USC §956(a). Although convicted at trial of additional charges, Mr. Daud did not engage in conduct which was

5

substantially different or more culpable than the conduct of his co-defendants who were not convicted of an offense under 18 USC §956(a).

### Acceptance of Responsibility

Mr. Daud does not seek acceptance of responsibility under USSG §3E1.1(a) as he chose to go to trial and put the Government to its burden to prove his guilt. This was the basis stated in the preliminary PSR for denying acceptance under §3E1.1(a). Mr. Daud believes he has not denied the facts which resulted in his conviction under 18 USC §956(a). He does deny providing ISIL contact information to Abdullahi Yusuf in May of 2014. He believes the PSR is confused in stating that he denies contact with his co-defendants following the interception of them in New York City in November of 2014. He admits that he maintained contact with his co-defendants after they were stopped by the FBI. In response to the preliminary PSR, Mr. Daud only maintained that prior to their departure, and after he had discussed stealing passports and leaving by November 8, 2014, that he did not carry out this plan and instead stopped meeting with his co-defendants for a period of time.

### Offense Level Computation

Defendant objects to application of the 12 level enhancement under USSG §3A1.4, on the grounds that there is not sufficient evidence to conclude that Defendant had the specific intent to commit a federal crime of terrorism "calculated to influence or affect the conduct of government by intimidation or coercion."[1] The final PSR, in

---

[1] A "federal crime of terrorism" as defined by 18 USC §2332b(g)(5) must be a conviction under one of the statutes listed at 18 USC §2332b(g)(5)(B) and be an "offense that is

responding to Defendant's objections to the draft PSR, concludes that the conduct underlying Defendant's convictions was intertwined and, at least with respect to the 18 USC §2339B convictions, Mr. Daud's convictions "were calculated to influence or affect the conduct of at least the United States government by intimidation or coercion." (PSR, p. A.3). The basis for this conclusion is that Mr. Daud's admitted internet ideological mentor, Anwar Al-Awlaki, as well as ISIL itself, have either called for or carried out actual attacks against the United States. *Id.*

Defendant acknowledges that the applicability of USSG §3A1.4 does not turn on his motive, or his rationale for his particular conduct. If it did, there would be a complete absence of information that Mr. Daud's personal motive or rationale for his action was to "intimidate or coerce" the United States. Rather, "calculation" is concerned with the object that Defendant sought to achieve. The Guideline imposes a requirement that the "underlying felony be calculated to influence or affect the conduct of government by intimidation or coercion." United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010).

Typically, one thinks of a terrorist act as "calculated" to "intimidate or coerce" a government because such an act combines an act of violence with a political position or demand. The bombing of a government building or civilian institution, coupled with a political demand directed at a government, clearly is "calculated" to influence a

---

calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."18 USC §2332b(g)(5)(A). The sentencing enhancement at USSG §3A1.4 then applies if the offense of conviction "involved, or was intended to promote, a federal crime of terrorism." Thus, it is not sufficient to merely be convicted of a statute listed at 18 USC §2332b(g)(5)(B) in order to apply the enhancement under USSG §3A1.4.

government by "intimidation or coercion" even if the intent of the individual participant is merely to die as a martyr or express one's dedication to a cause. The travel of a handful of young men to "join, and fight with, ISIL," when they lack any military training, specific skills, or access to their own weapons, has such a marginal effect upon the ability of ISIL to carry out acts of terrorism that it can hardly be said that their actions were "calculated" to "intimidate or coerce" the United States. As alleged by the Government at trial, and as found by the jury, Mr. Daud had the object of "joining, and fighting with, ISIL" regardless of whether his actions would "intimidate or coerce" the United States or any other government.

Further, the conflict in Syria is extremely complex and entangled, involving various governments acting through proxies, armed groups which represent various sectors of the population, and multiple organizations which are designated Foreign Terrorist Organizations (FTOs) under U.S. law. ISIL itself is engaged in conflict with a number of groups which are designated by the United States to also be Foreign Terrorist Organizations and which do not constitute governments. These groups in conflict with ISIL include Hezbollah which supports the Syrian regime (Lister, 5/12/16, p.31), Syrian affiliates of the Kurdistan Workers Party (PKK) (Lister, 5/12/16, p. 136-137), and the al-Queda affiliated al-Nusra Front (Lister, 5/12/16, p.68). Given this complexity, there simply is no basis in the current version of the offense conduct to establish that Defendant had the intent to commit an offense that was calculated to affect the conduct of any particular government by intimidation or coercion, as opposed to being calculated to affect the conduct of a non-governmental actor.

To the degree that USSG §3A1.4 is applied on the basis that the Syrian regime was the object of Defendant's calculations, Defendant would object that the regime of Bashar al-Assad is not recognized as the government of Syria. As early as July 12, 2011, United States Secretary of State Hilary Clinton publically stated that Syrian President Bashar al-Assad has "lost legitimacy."[2] On October 9, 2011, the National Transitional Council, acting as the government of Libya, recognized the Syrian National Council as the "sole legitimate government in Syria."[3] On December 11, 2012, President Barack Obama, announced that the United States would recognize the Syrian Opposition Coalition as the "legitimate representative of the Syrian people in opposition to the Assad regime."[4] The governments of the United Kingdom, France, and the Gulf Co-Operation Council have similarly recognized the Syrian National Coalition as the "legitimate representative" of the Syrian people.[5] In March of 2013, the Arab League provided that the Syrian National Coalition would represent Syria and occupy its seat at the Arab League. The Arab League had previously recognized the Syrian National Coalition as the legitimate representative of the people of Syria and suspended the membership in the Arab League of President Bashar al-Assad and his government.[6]

Defendant also notes that expert testimony at trial, as well as widely available media reports, establish that the United States government has funded, armed, and trained

---

[2] http://www.politico.com/story/2011/07/clinton-assad-has-lost-legitimacy-058766
[3] https://www.washingtonpost.com/world/new-libyan-government-recognizes-syrian-opposition-council/2011/10/19/gIQAJ3kVyL_story.html.
[4] http://www.cnn.com/2012/12/11/world/us-syria-opposition/index.html.
[5] http://scholarship.shu.edu/cgi/viewcontent.cgi?article=1312&context=student_scholarship
[6] http://www.aljazeera.com/news/2013/03/2013325105453834.html

9

rebel forces in Syria with the explicit purpose of overthrowing the regime. These acts of the United States government involve violence and are "calculated" to influence the Syrian regime. It is a violation of customary international law for one state to use force against the recognized government of another state. The Republic of Nicaragua v. The United States of America, International Court of Justice, ICJ Rep 14 (27 June 1986). Such use of force can only be justified if it consists of an act of "individual or collective self-defense" in response to "armed attack." Article 52, United Nations Charter. If the Bashar al-Assad regime is determined to be the legitimate government of Syria for purposes of applying the enhancement under USSG §3A1.4, then this is tantamount to a judicial finding that the United States government has violated international law by funding, arming, and training military units to kill members of the recognized armed forces of the Syrian Arab Republic.

With respect to Paragraph #157 of the PSR, Defendants notes that the jury instructions for the conspiracy to commit murder abroad under 18 USC §956(a) did not require the jury to find that Mr. Daud intended to kill any particular person, at any particular place, in any particular manner, or at any particular time. Mr. Daud could be convicted under these instructions even if his purpose or calculation was solely to engage in fighting against non-governmental actors, without the knowledge of any government. As such, the jury verdict alone does not support a finding that Mr. Daud's violation of 18 USC §956(a) had the calculated purpose to influence or affect the conduct of government by intimidation or coercion.

With respect to Paragraph #163 of the PSR, Defendant notes the jury instructions for both the conspiracy and attempt offenses under 18 USC §2339B provided that: "There is no requirement that the government prove that the defendant acted with the specific intent to further the terrorist activities of the organization." As such, the jury verdict alone does not support a finding that Mr. Daud had the calculated purpose to influence or affect the conduct of government by intimidation or coercion through his intended support for ISIL.

## Criminal History Category

By separate motion, Mr. Daud has requested the Court, pursuant to USSG §3A1.4(b), to depart from the PSR's determination that Mr. Daud is assigned Criminal History Category VI. Mr. Daud also objects to the application of the enhancement under USSG §3A1.4(b). Mr. Daud has no criminal history points under USSG §4A1.1. To the degree that the offense conduct of the instant offense is the sole basis for assigning him to Criminal History Category VI, and also the basis for applying a 12 level enhancement to the base offense level, the enhancement impermissibly double counts his offense conduct.

## CALCULATION OF GUIDELINE SENTENCE

Pursuant to the objections above, Count I should have an adjusted offense level of 33, Criminal History Category I, for a Guideline sentencing range of 135-168 months.

Pursuant to the objections above, Count 2 and Count 6 should have an adjusted offense level of 28, Criminal History Category I, for a Guideline sentencing range of 78-97 months.

Date: <u>November 3, 2016</u>               ___<u>S/ BRUCE D. NESTOR</u>_____
                                            Bruce D. Nestor, MN #0318024
                                            DE LEÓN & NESTOR, LLC
                                            3547 Cedar Ave. South
                                            Minneapolis, MN 55407
                                            (612) 659-9019
                                            (612) 436-3664 – Facsimile

                                            **ATTORNEY FOR ABDIRAHMAN DAUD**