UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No: 15-CR-00049(MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff(s) | ) | **ABDIRAHMAN DAUD'S** |
| v. | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| ABDIRAHMAN YASIN DAUD (4), | ) | |
| | ) | |
| Defendant | ) | |

## INTRODUCTION

Abdirahman Daud is a 22 year old youth appearing before this Court facing a potential sentence of life in prison. Before his arrest on April 19, 2015, he had never spent time in any jail or prison. Before his involvement in this offense from March of 2014, until his arrest, he had not engaged in criminal activity. He has never caused physical harm to another human being. Other than his conduct in this offense which resulted in his conviction by a jury for his crimes, Mr. Daud by all accounts has led an exemplary life.  A life characterized by service to others, by respect for people young and old, by nurturing of his younger siblings and love for his family, by hard work, and by an avoidance of conflict and violence.

Mr. Daud is both insightful and remorseful regarding his past thoughts and actions that led him to conspire with others to join ISIL. He recognizes that he knew he would have ended up fighting on behalf of ISIL, even while struggling with what his true intent and motivation was from March of 2014 to April of 2015. This struggle reflects the conflict between his desire to affirm his inner humanity as demonstrated by the majority

of his life and his current acceptance of the extraordinary brutality and violence carried out by ISIL and those, like him, who seek to "join, and fight with, ISIL." His thoughts and actions that bring him before this court for sentencing are condemned by Mr. Daud, by his family, by the Somali community in Minnesota, by the wider Minnesota community of which he is a part, and by the Government. He acknowledges that he will be punished by incarceration and continued separation from his family and society for his crimes. He seeks a just sentence from this Court: a sentence that punishes and deters criminal conduct while also providing a path for Mr. Daud to demonstrate that he is open to change, growth, and continued critical reflection about the path towards violence that he had chosen and now rejects.

## CONSIDERATION OF INDIVIDUALIZED SENTENCING FACTORS REQUIRED BY 18 USC §3553(a)

As determined by the Presentence Report, the United States Sentencing Guidelines recommend that Abdirahman Yasin Daud should spend the rest of his life in the custody of the United States Bureau of Prisons. The Court is required by statute to consider the Guidelines' sentencing range as one factor in imposing a sentence. 18 USC §3553(a)(4)(A). Short of ordering Mr. Daud's execution, a life sentence without the possibility of parole is the most severe sentence that any court can impose. What weight should the Court give to this recommendation of a life sentence for Mr. Daud?

The Guidelines recommendation of a life sentence results from application of the "Terrorism" enhancement at §3A1.4 and applies to any offense that involved, or was intended to promote a federal crime of terrorism, regardless of a defendant's role in the

offense and regardless of the harm caused by the defendant's conduct.  U.S. v. Stewart, 590 F.3d 93, 154 (2nd Cir. 2009)(Judge Calabresi concurring)(federal crimes of terrorism encompass a broad range of conduct with vastly different levels of intent and harm to society). An individual who deliberately plans, carries out, and executes a violent attack on civilians which demonstrates both the intent and capacity to commit mass acts of violence has the same offense level enhancement and criminal history category under §3A1.4 as a young man engaging in an relatively unsophisticated, poorly planned, attempt to travel abroad where he intends to join an organization that he knows is engaged in terrorism and may or may not actually end up committing acts of violence. Further, the enhancement under §3A1.4 fails to give any consideration to Defendant's age, receptiveness to rehabilitation, propensity to violence, and other factors, all of which differentiate Mr. Daud's crime from that of a committed, hardened terrorist to whom the full force of the enhancement should perhaps apply. As such, Defendant contends that the sweeping and severe nature of the enhancement under §3A1.4 particularly demands of the Court an individualized approach to sentencing in this case based on 18 USC §3553(a) factors. A sentence outside the Guidelines is particularly appropriate and necessary in this case.

The "terrorism" enhancement at §3A1.4 also departs from the traditional role of the sentencing guidelines. The Guidelines were initially developed in 1986, in the main, using an empirical approach based on data about past sentencing practices. Kimbrough v. United States, 128 S.Ct. 558 (2007). At the time that USSG §3A1.4 was promulgated, there was little empirical research data on terrorism sentences. *Deconstructing United*

3

*States Sentencing Guidelines Section 3A1.4,* 28 Law and Inequality 51, 115, James P. McLoughlin, Jr. (2010). Instead, the enhancement was simply adopted by the Sentencing Commission at the direction of Congress and represents a political judgment not a judicial determination. *Id.,* p.51. As such, Defendant contends that the Guidelines sentencing range should be given less weight in this case than when that sentencing range is based on empirical data about past sentencing practices.

This focus on Mr. Daud as an individual is particularly necessary in this case. It is mandated by 18 USC §3553(a). It is consistent with judicial practice: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crimes and the punishment to ensue." <u>Gall v. United States</u>, 552 U.S. 38, 52 (2007), quoting, <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996). Those individualized sentencing factors mandate a sentence that does not even approach the Guidelines recommendation of life imprisonment.

<u>**Nature and Circumstances of the Offense**</u>

It is extraordinarily difficult to seek to point out any mitigating factors with respect to Mr. Daud's role and involvement in a terrorism offense without seeming to excuse his conduct or minimize the seriousness of the offense. However, all human actions and decisions, with the possible exception of those committed by sociopaths, are characterized by nuance, complexity and contradiction. Mr. Daud believes that the following points are supported by the PSR and the record developed at trial:

- Mr. Daud was exposed to and read Anwar Al-Awlaki prior to March of 2014. Despite having travel documents valid through April 9, 2014, Mr. Daud made no effort to depart the United States to join ISIL or any other designated foreign terrorist organization prior to expiration of his travel documents.

- Mr. Daud applied for travel documents in April of 2014 and had a pending N-600 filed with USCIS. Although his only ability to obtain legitimate travel documents depended on either of these applications being approved, he took no steps to obtain approval or to comply with requests for evidence related to the filings despite being engaged in discussions about travel to Syria to join ISIL during this period of time.

- Mr. Daud's intent to travel to Syria grew with the departure of Hanad Mohallim and the departure of others in the late spring of 2014, including Abdi Nur and Yusuf Jama. Mr. Daud played no role in facilitating these early departures, unlike other co-conspirators who went on shopping trips, provided funds to travelers, sanctioned Syria as a place of "legitimate jihad," or provided rides to the airport. Absent these early departures, it is less likely that Mr. Daud would have developed and carried out serious plans to travel to Syria to join ISIL.

- Mr. Daud's verbal expressions of an intent to leave the United States by driving to California in May of 2014, and by stealing passports in November of 2014, were not followed up by actual actions to locate a contact in Mexico for falsified passports or actions to steal passports from others. Absent travel documents, any plans in May of 2014 or November of 2014 were inherently implausible and reflected a lack of clear capability to carry out such plans.

- Mr. Daud never had a leadership role among his co-conspirators and did not recruit others to travel to Syria to join ISIL.

- Mr. Daud did not publicly promote ISIL on social media or through other means.

- Mr. Daud lacked any training, military skills, or familiarity with weapons. He never possessed, or sought to possess, firearms, dangerous weapons, or explosives. His capability to commit acts of violence was limited.

- Mr. Daud's intent and desire to travel to Syria waxed and waned over time. The perception of being investigated by the FBI, or of imminent arrests, was at least one driver of actual plans to depart the United States in addition to the intent to join ISIL.

- The absence of any evidence during trial that Mr. Daud watched significant amounts of ISIL propaganda videos was striking. This supports a finding that he was not attracted to visual depictions of violence and had a relatively lower intent or motivation to engage in acts of violence on behalf of ISIL if he reached Syria.

- Mr. Daud was a religious man seeking a path towards becoming a better Muslim. The absence of appropriate, English speaking and culturally American religious mentors in his community led him to be attracted to on-line mentors who promoted intolerance and violence as a means of responding to actual suffering of Muslims outside the United States. Regardless of how contradictory it sounds, his desire to help others experiencing great suffering was intertwined with the plans to "join, and fight with, ISIL."

The mere fact that Mr. Daud was arrested by the Government before he could reach Syria to join ISIL and end up fighting on its behalf does not necessarily mean he is deserving of less punishment. Taken as a whole, however, Mr. Daud's lack of any leadership role, lack of recruitment of others, lack of planning to overcome the obstacles that prevented him from leaving the United States prior to April of 2015, and absence of a specific intent to kill particular individuals, in a particular manner, at a particular location, or a particular time, is indicative of some ambivalence about whether he firmly wished to "join, and fight with, ISIL," or whether he was instead only caught up in an allegiance and belief in an abstract goal. A young man who has only witnessed fighting in video games or snippets of propaganda videos cannot fully comprehend the pain and suffering that real violence inflicts on people. There is a difference between "wanting to fight" and actually "fighting" – if only to the degree that actually inflicting pain and death on other human beings corrodes the soul and makes change and rehabilitation more difficult. The nature and circumstances of the offense, and Mr. Daud's role in it, does not support a sentence of life in prison.

6

## History and Characteristics of the Defendant

Mr. Daud's character is not solely defined by his conduct and participation in this offense. If it was, there would be no need to consider the "history and characteristics of the defendant" as mandated by 18 USC §3553(a)(1). Consideration of Mr. Daud's individual history and characteristics uniformly reveal strong mitigating factors which indicate the potential of Mr. Daud to grow and change from the person who sought to travel to Syria and join ISIL.

Abdirahman Daud during an interview with the preparer of the PSR provided an extensive statement about how he was drawn into an extremist ideology beginning at age 17. (PSR, ¶198-205). This was a largely a solitary process as he was not yet close to his co-defendants or others who supported such interpretations. In March of 2014, when Hanad Mohallim departed to Syria to join ISIL, Mr. Daud was 20 years old. While not a juvenile, psychological research has demonstrated that the human brain "does not reach its ultimate state of development until adolescents reach their mid-twenties…." United States v. Webster, 820 F.3d 944, 949 (8th Cir. 2016)(Bright J., dissenting). Mr. Daud himself now believes that the "zealousness" of youth contributed to his actions of "implanting an identity in myself which largely excluded my family and much of my community." (PSR, ¶150, 202, 204). The psychological development of the adolescent brain through the mid-twenties is extensively discussed in sentencing memoranda submitted by Mr. Daud's co-conspirators and supports Mr. Daud's age as a mitigating factor. Mr. Daud adopts these general points of analysis by reference. (*Joint Sentencing Memorandum of Hamza Ahmed, Adnan Farah, Zacaria Abdurahman, Hanad Musse, and*

7

*Abdullahi* Yusuf, ECF #703, pp.38-46). His relative youth helps to explain the sharp contrast between Mr. Daud's participation in this offense and his behavior in the rest of his life. It also helps to provide assurances that as Mr. Daud grows and gains insight into his own thinking and behavior, he is less likely to re-offend at an older age.[1]

Mr. Daud's exposure to Al-Awlaki through the internet coincided with his leaving public school, South High School, in 2011. (PSR, ¶212). He gave up playing junior varsity basketball at South High School and enrolled in Heritage Academy, where his exposure to broader American culture and people of different backgrounds decreased. These changes in his life, coinciding with his increasing exposure to a sophisticated propaganda message regarding the oppression of Muslims around the world, led eventually to Mr. Daud feeling that he "always had two lives in my head" - one life in the United States, and one life abroad "in a utopia where he could be accepted." (PSR, ¶202).

This duality in his mental processes was mirrored in his daily life as he grew up. When Mr. Daud first arrived in the United States at age nine in 2003, he lived with his elderly Somali grandparents. (PSR, ¶181). He then lived with his extended family, where only Somali was spoken in the home. (PSR, ¶183). Meanwhile, Mr. Daud was rapidly learning English, attending school, and serving as the first "American" in the family to help his "many family members navigate and adjust to life in [the United States]." (PSR, ¶190). He helped to pay bills, assisted his younger siblings with their homework, and

---

[1] Although not completed as of the date of submission of this Sentencing Memorandum, Dr. Chinmoy Gulrajani is completing a psychological report on Mr. Daud. Mr. Daud anticipates that this report will also contribute to an understanding of how the impulsiveness of youth, particularly adolescent males, represents a mitigating factor with respect to Mr. Daud.

attended parent-teacher conferences at school for his younger brothers and sisters. As explained in great detail in the Joint Sentencing Memorandum filed by his co-conspirators, young Somalis who come of age while experiencing identity confusion are particularly vulnerable to extremist recruiters who provide simple answers to these questions of divided identity. (*Joint Memorandum*, ECF #703, pp.21-37). All of the factors identified in the Joint Memorandum as contributing to this vulnerability to recruitment are present in Mr. Daud's case: relative family poverty, household stressors, insulating religious beliefs and family life, educational difficulties, and a sense of divided identity. (PSR, ¶182-183, 187, 189-190).

Substantial evidence shows that, outside his increasing attraction to extremist ideology and planning to travel to Syria to join ISIL which he kept secret from his family and community, Mr. Daud was a peaceful and respectful person in his daily life. His family members describe him as "a mediator and peacemaker." (PSR, ¶191). In his daily life, he maintained friendships with people of all different faiths and ethnicities. *Id*. A close friend who has stood by Mr. Daud throughout the difficult circumstances of his arrest describes his "kind demeanor." (PSR, ¶193). During Mr. Daud's detention hearing held on May 22, 2015, the Court received testimony from Jean Emmons, a youth program coordinator with a local social service agency. From 2008-2010, Mr. Daud started as a participant in an after-school program and was then hired as a student intern to supervise 2nd and 3rd graders. In a letter to be submitted to the Court, she describes Mr. Daud's demeanor as one characterized by "respectfulness and calmness." He was an excellent mediator and peacemaker who never lost his temper "regardless of the

9

provocation." In summary, she describes him "as supportive and committed as any adult professional. His performance was remarkably consistent, especially for such a young person." These comments on Mr. Daud are also echoed by Osman Sheikyusuf, an employee of the Minneapolis Public Schools as a Dean of Students, in a letter to be submitted to the Court. He has known Mr. Daud for many years. He has observed Mr. Daud serving others, volunteering time to supervise children so they can play, tutoring students, and visiting the sick in hospitals. He hopes that Mr. Daud can have a second chance to atone for the grave mistakes he has made.

Mr. Daud's personal history and characteristics, as described by the persons who know him best, stand in such sharp contrast to his participation in this offense so as to be confounding and bewildering: what would cause a peaceful, law-abiding person, with strong family relationships, to seek to travel overseas to join ISIL and to fight on its behalf? The answer to this question cannot be found simply by ascribing to Mr. Daud some perverse attraction to and fascination with violence or hatred of non-Muslims. Rather, the answer lies in a complex interaction between the material reality of great suffering in the world, a desire of an idealistic and devout man to address that suffering, and the ability of sophisticated ideologues to target and manipulate young people who are struggling to find their identity in the world. Mr. Daud deserves an opportunity to win that battle for his soul and to demonstrate that his inner character, as demonstrated in his real, day-to-day life, can win out over the fantasies and evil that he allowed to take over his thoughts as he conspired to "join, and fight with, ISIL."

## Acceptance of Responsibility

Further mitigating factors in Mr. Daud's history and characteristics have arisen after his participation in this offense: his acceptance of responsibility, expressions of credible remorse, and development of a cognitive opening to reject extremist ideology.

Mr. Daud was arrested on April 19, 2015, as he took possession of false passports with the plan to leave the United States, travel to Syria, and join ISIL. He did not return to this District until his initial appearance on May 19, 2015. Five months later, without extending a potential plea agreement to Mr. Daud, the Government indicted him on October 21, 2015, with the more serious charge under 18 USC §956(a).

Admittedly, Mr. Daud did not immediately start to shed his desire to join ISIL simply because his plot was discovered and he was arrested. Had he done so quickly, essentially performing a 180 degree turn between wanting to join a terrorist organization and then proclaiming the error of his ways, his credibility and motivation could be called into question. Mr. Daud's adoption of an extremist ideology did not happen overnight; nor could it be expected to disappear overnight.

On December 11, 2015, eight months after his arrest, Mr. Daud contacted the Government and sought to enter into a plea agreement which would resolve all remaining charges upon dismissal of the 18 USC §956(a) charges. (Attached as Exhibit A). This offer was communicated on behalf of all remaining defendants, and Mr. Daud and his counsel played a key role in securing the willingness of the remaining defendants to make this offer. The Government was within its right to reject this offer, and it did so.

However, the specific terms of the offer made by Mr. Daud reflected his acceptance of responsibility and willingness to publicly condemn ISIL and the violence it carried out.

Mr. Daud has submitted a lengthy statement which is included in the PSR. (PSR,¶150). He admits the facts which resulted in his conviction, affirms that he was not entrapped by the Government or its agents, and demonstrates an understanding and rejection of ISIL. He specifically discusses his rejection of ISIL's "violent ideology," his acceptance and appreciation of person's with different faiths and cultural backgrounds, and his openness to "ideas of which I was not aware of in the past."

Mr. Daud is still 22 years old. He has spent the past 19 months incarcerated. However, his actions and statements in the past 12 months demonstrate that his mind is open to understanding and rejecting the thoughts and actions which led him to conspire to travel to Syria to "join, and fight with, ISIL." He has moved substantially along this path with only his own motivation and the support of his family which has visited him almost every week that he was in custody in San Diego, and the Washington and Sherburne County jails. He has the intellectual capacity, the educational background, and the family and community support necessary for this Court to be reasonably assured that a sentence in line with that received by his co-defendants will "protect the public from further crimes of the defendant." 18 USC §3553(a)(2)(C).

## Avoidance of Unwarranted Sentence Disparities

18 USC §3553(a)(6) directs the Court, "in determining the particular sentence to be imposed," to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Mr.

12

Daud contends that the Court, in seeking to avoid sentencing disparities, should not exclude cases in which defendants were convicted of less serious offenses simply because the Government offered them a more lenient plea deal.

All co-defendants who plead guilty, either during the course of establishing a factual basis for their plea agreement or during their trial testimony, admitted that they conspired to travel to Syria to join, and fight with, ISIL. Under the jury instructions provided at trial for Count I, this would have been a sufficient factual basis to convict each co-defendant of a violation of 18 USC §956(a). Further, as noted in Paragraph 138 of the Pre-Sentence Report, each co-defendant is properly considered an average participant in the offense. Thus, although convicted at trial of more serious charges than his co-defendants who were offered a plea agreement by the Government to a single count under 18 USC §2339B, Mr. Daud did not engage in conduct which was substantially different or more culpable than the conduct of his co-defendants who were not convicted under 18 USC §956(a). Further, Mr. Daud's conduct which supported the 18 USC §956(a) conviction is substantially less serious than the conduct of defendants in other cases, outside of this conspiracy, convicted of the same offense.

**Co-Conspirators** – Each of Mr. Daud's co-conspirators who entered a guilty plea to a violation of 18 USC §2339B, did so based upon a factual basis that they conspired to provide support to ISIL in the form of "personnel." Their guilty pleas, as well as the evidence presented by the government at trial, made clear that each co-conspirator engaged in virtually identical conduct by seeking to provide themselves as "personnel" to "join, and fight with, ISIL." This conduct is precisely the conduct which formed the basis

for Mr. Daud's indictment and conviction under 18 USC §956(a). See, Second Superceding Indictment, Count I, Paragraph 3(a), ECF # 292. At trial, the Government also did not introduce any evidence that Mr. Daud intended to engage in fighting on ISIL's behalf in a manner which was significantly different than any other co-conspirator who sought to "join, and fight with, ISIL."

Abdullahi Yusuf - In his guilty plea, entered on February 26, 2015, Abdullahi Yusuf testified that between March 1, 2014, and June 1, 2014, he became aware of a "group of individuals" who "desired to travel overseas to join organizations that were fighting against the Syrian president, Bashar al-Assad." (15-CR-46(MJD); ECF #64, p.20). He admitted that he participated in meetings and discussions of people with this goal, and that he and Abdi Nur planned to "jointly travel together to Syria to join ISIL." Id. p.22. While Mr. Yusuf was arrested before he could leave the United States, Mr. Nur was not and made it to Syria where he was "currently fighting with ISIL." Id.

Mr. Yusuf's trial testimony was consistent with this aspect of his guilty plea. He testified that in the Spring of 2014 he joined a group that had the purpose of traveling to Syria to fight for ISIL. (Transcript, 5/13/16, p.69). He specifically testified that it was his goal to join ISIL, attend an ISIL training camp, and to engage in "fighting the Assad regime wherever [ISIL] sent me." (Transcript, 5/13/16, p.89). He agreed that he would not be fighting with his bare hands and expected to use "guns, rocket launchers, anything that I was trained to use." Id.  He expected to use those weapons against other people, knowing that the result of doing so is that people would die. (Transcript, 5/13/16, p.90).

Mr. Yusuf also attempted to depart the United States in May of 2014 for the purpose of joining and fighting with ISIL. This attempt to provide material support to ISIL was ultimately not charged as part of his plea agreement.

Mr. Daud contends that the facts admitted by Mr. Yusuf, which explain the manner and objectives of his conspiring to provide "personnel" as a form of material support, would also support a conviction under 18 USC §956(a) based upon the jury instructions given at trial.

<u>Abdirizak Warsame</u> – Mr. Warsame appeared before the Court and entered a guilty plea on February 11, 2016. During the course of establishing a factual basis for his plea under 18 USC §2339B, Mr. Warsame was asked by the Court if he knew what he was going to do if he reached Syria and joined ISIL. Mr. Warsame replied that he would be "engaging in combat." He stated he would be "fighting, training, and being a citizen of the so-called Islamic State." To him, "combat" meant "beheadings and just fighting with weapons against anyone that was opposed to the Islamic State." (Plea Transcript, pp. 29-30, Feb. 11, 2016).

Mr. Warsame's trial testimony was consistent with the factual basis for his guilty plea, at least with respect to his intent to "join, and fight with, ISIL."  On direct examination, Mr. Warsame was asked, "Did you make any ultimate decisions about what you wanted to do with respect to ISIL?" He responded, "Yes. To go fight for them." (Transcript, May 24, 2016, p.17). Later on direct examination, he was asked if "by fighting for ISIL, did you know that meant killing people for ISIL." Mr. Warsame

replied, "Yes." (Transcript, May 24, 2016, p.57). This included "many different types of people" including "Shiah, the Yazidis, PKK, Peshmerga." *Id,* p.58.

Mr. Daud contends that the facts admitted by Mr. Warsame, which explain the manner and objectives of his conspiring to provide "personnel" as a form of material support, would support a conviction under 18 USC §956(a) based upon the jury instructions given at trial.

Hanad Musse – On September 9, 2015, Mr. Musse appeared before this Court and entered a plea of guilty to a single count of conspiracy to provide material support to ISIL in violation of 18 USC §2339B. A count of attempt to provide material support to ISIL in violation of 18 USC §2339B, based on Mr. Musse's travel to New York in November of 2014, will be dismissed at sentencing pursuant to the terms of his plea agreement.

In establishing a factual basis for his plea, Mr. Musse explained that he wanted to "travel to Syria to fight for ISIL." (Transcript, September 9, 2015, p.23). He was aware of ISIL beheading people, taking hostages, and raping women. *Id*., p.23-24. Despite this knowledge, Mr. Musse still wanted "to go to Syria" in order "to fight against [Bashar al-Assad's] forces." *Id*., p.34. He was prepared to fight against the Syrian army, other rebels, and other designated terrorist organizations who opposed ISIL. *Id*., p. 37.

Mr. Daud contends that the facts admitted by Mr. Musse, which explain the manner and objectives of his conspiring to provide "personnel" as a form of material support, would support a conviction under 18 USC §956(a) based upon the jury instructions given at trial.

<u>Zacharia Abdurahman</u> - On September 17, 2015, Mr. Abdurahman appeared before this Court and entered a plea of guilty to a single count of conspiracy to provide material support to ISIL in violation of 18 USC §2339B. A count of attempt to provide material support to ISIL in violation of 18 USC §2339B, based on Mr. Abdurahman's travel to New York in November of 2014, will be dismissed at sentencing pursuant to the terms of his plea agreement.

In establishing a factual basis for his plea, Mr. Abdurahman acknowledged that he was aware of people fighting against ISIL in Syria and of ISIL engaging in beheadings. (Transcript, September 17, 2015, p.32). His purpose in traveling to New York in November of 2014 was "to join ISIS." *Id*., p.35. He was aware that other young men from Minnesota had traveled to Syria, joined ISIL, and been killed. *Id*., p.38.  As late as April of 2015, he still wanted to travel to Syria to join ISIL. He only pulled back from the false passport scheme proposed by a government informant because he was afraid that he would be caught. *Id.*, p.40.

Mr. Daud contends that the facts admitted by Mr. Abdurahman, which explain the manner and objectives of his conspiring to provide "personnel" as a form of material support, in combination with the evidence that the Court heard at Mr. Daud's trial, would support a conviction under 18 USC §956(a) based upon the jury instructions given at trial.

<u>Hamza Ahmed</u> – On April 25, 2016, Mr. Ahmed appeared before this Court and entered a plea of guilty to a single count of conspiracy to provide material support to ISIL in violation of 18 USC §2339B. A count of attempt to provide material support to ISIL in

violation of 18 USC §2339B, based on Mr. Ahmed's travel to New York in November of 2014, will be dismissed at sentencing pursuant to the terms of his plea agreement.

In establishing a factual basis for his plea, Mr. Ahmed acknowledged that he watched videos showing ISIL engaged in "fighting and shooting and other types of violent acts" during "war-like situations." (Transcript, April 25, 2016, p.36). He was aware of ISIL executing unarmed prisoners. *Id.*, p.37. He was aware of other young men from Minnesota who traveled to "Syria to fight with ISIL." *Id.*, p.40. He conspired with others in "joining [ISIL]" in order to help ISIL "any way that we could." *Id.,* p.35.

Mr. Daud contends that the facts admitted by Mr. Ahmed, which explain the manner and objectives of his conspiring to provide "personnel" as a form of material support, in combination with the evidence that the Court heard at Mr. Daud's trial, would support a conviction under 18 USC §956(a) based upon the jury instructions given at trial.

**18 USC §965(a) Convictions** – In order to convict Mr. Daud, the jury did not have to make any findings with respect to whether Mr. Daud conspired to kill any particular individual, the manner in which Mr. Daud and his co-conspirators intended to kill others, or the time or location of any killing which was the object of the conspiracy. All killing on behalf of ISIL constituted "murder" under the jury instructions, regardless of whether an individual held a subjective belief that he would be defending himself or others or engaging in combat with the armed forces of a brutal dictator accused of war crimes. The Government introduced no evidence at trial that Mr. Daud specifically conspired or intended to kill in a particularly depraved manner or target any particular

individuals. Both with respect to the 18 USC §2339B counts, and the 18 USC §956(a) count, the Government was not required to prove that Mr. Daud intended to commit a specific terrorist act targeting civilians, helpless prisoners, or other innocent people. The Government met its burden by simply proving that Mr. Daud intended to "join, and fight with, ISIL." Without minimizing the seriousness of the crime of which he was convicted, Mr. Daud asserts that his conduct is less deserving of a lengthy sentence of incarceration than the conduct of defendants convicted under 18 USC §956(a) in other cases.

United States v. Mahamud Said Omar, 09-CR-242 (MJD/FLN) – Mr. Omar was convicted at trial of two counts under 18 USC §2339A, two counts under 18 USC §2339B, and a single count under 18 USC §956(a). On May 13, 2013, this Court sentenced Mr. Omar to a term of 240 months on the 18 USC §956(a) count. Mr. Omar's conduct included actual travel to a war zone, staying at and helping to fund a safe-house for aspiring Al-Shabaab fighters, providing funds for the purchase of weapons including AK-47 firearms, and recruiting others to travel to Somalia for the purpose of fighting with Al-Shabaab. Mr. Omar persisted in this activity even after one young man from Minnesota, Shirwa Ahmed, blew himself up in a suicide bombing in Somalia which killed numerous civilians. A sentence for Mr. Daud of substantially less than 240 months would not result in an unwarranted sentencing disparity as compared to Mr. Omar, given the differences in their conduct with respect to recruiting others and direct exposure to and involvement with members of a designated terrorist organization in its theatre of operations.

United States v. Ralph De Leon and Sohiel Kabir – 12-CR-00092 (Central District of California) –Mr. De Leon was convicted at trial of one count of 18 USC §956(a) and one count of 18 USC §1117, conspiracy to kill officers and employees of the United States, in addition to material support counts under 18 USC §2339A and 18 USC §2339B. His co-defendant, Sohiel Kabir, was convicted of material support counts and of the 18 USC §1117 conspiracy. It was their intention to travel to Afghanistan to join Al-Queda and kill members of the armed forces of the United States. On February 23, 2015, they were sentenced to a total term of 300 months on these counts of conviction. A sentence for Mr. Daud of substantially less than 300 months would not result in an unwarranted sentencing disparity as compared to Mr. De Leon, given the differences in their conduct with respect to the intent to murder members of the armed forces of the United States.

United States v. Shelton Bell, 13-CR-00141 (Middle District of Florida) – Although not convicted of a stand-alone 18 USC §956(a) count, Shelton Bell was convicted by guilty plea of two counts of providing material support under 18 USC §2339A, "knowing and intending that the material support and resources were to be used in preparation for and in carrying out violations of 18 USC §956(a)." On January 14, 2015, he was sentenced to a term of 240 months in prison. Mr. Bell was subject to enhancements under the Guidelines for playing a leadership role, USSG §3B1.1(c) and use of a minor to commit a crime, USSG §3B1.4. Mr. Bell was the leader of a group of young people who he encouraged to travel to Yemen for the purpose of joining the Designated Foreign Terrorist Organization, Ansar al-Sharia, an affiliate of Al-Queda. He

supplied firearms to others to train for combat. He recorded videos urging others to join his cause and directed that those videos be posted on-line. While armed with a handgun, for the purpose of shooting anyone who might interfere including police, Mr. Bell and one other member of his group went to a cemetery at night and partially destroyed two statues of Jesus. Mr. Bell fashioned homemade explosives and tested and refined those devices to "achieve greater explosions." He recorded videos of himself and his group setting off explosives and training with firearms and a 40 minute of himself preaching a message of "violent jihad." He and a juvenile under his influence then traveled to the Middle East in late 2012, where they were eventually detained by Jordanian authorities and returned to the United States. Upon his return, Mr. Bell was interviewed by law enforcement, released from custody, and he returned to Jacksonville, Florida, where he made plans to continue to recruit others to jihad and finance his activities by engaging in the unauthorized purchase of gold and food stamp fraud. A sentence for Mr. Daud of substantially less than 240 months would not result in an unwarranted sentencing disparity as compared to Mr. Bell, given the differences in their conduct.

United States v. Agron Hasbajrami, 11-CR-00623 (Eastern District of New York) Mr. Hasbajrami was convicted by his guilty of plea counts under 18 USC §2399A, on the basis that he conspired to provide and attempted to provide material support to terrorist organizations in Pakistan "knowing and intending that they were to be used in preparation for, and in carrying out" violations of 18 USC §956(a). Count II of the Superceding Indictment against Mr. Hasbajrami also charged as an object of the conspiracy under 18 USC §2339A "a conspiracy to kill one or more nationals of the

United States, to wit: United States military personnel stationed outside the United States" in violation of 18 USC §1111(a). After pleading guilty, being sentenced, and successfully withdrawing his plea, he was ultimately convicted on Count II of an Information, which charged a conspiracy pursuant to 18 USC §2339A, knowing and intending that the material support he conspired to provide would be "used in preparation for, and in carrying out, a violation of 18 USC §956(a)." The factual allegations in the Information alleged that Mr. Hasbajram intended to board a flight to Istanbul, Turkey, for the "purpose of traveling overseas to join a militant jihadist group that was engaged in combat operations against U.S. forces and others in Afghanistan and Pakistan." On August 13, 2015, he was sentenced to 192 months in prison. A sentence for Mr. Daud of less than 192 months would not result in an unwarranted sentencing disparity as compared to Mr. Hasbajram, given the differences in their conduct with respect to intending to kill members of the United States armed forces.

## **<u>CONCLUSION</u>**

Abdirahman Daud is a delightful young man. He is thoughtful, witty, occasionally funny, and always respectful. Following his arrest, he first met with undersigned counsel at the Metropolitan Correctional Center in San Diego, peering out of a narrow window in a maximum security unit. He was frightened and alone. Over the past 19 months, he has engaged in thoughtful reflection, verbal argument, and moral growth. His bonds with his family have grown immensely stronger, as he has watched them support him at great sacrifice much in the way that he used to support his mother, father, and siblings before he climbed into his car on April 17, 2015, on the long drive to San Diego with the hope

of reaching Sham. He is not the same man that climbed into that car. He seeks a sentence from this Court which reflects mercy and compassion for his mistakes and which is "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth at [18 USC §3553(a)(2)(A)-(D)]."


Date: <u>November 3, 2016</u>          <u>     *S/ BRUCE D. NESTOR*          </u>
Bruce D. Nestor, MN #0318024
DE LEÓN & NESTOR, LLC
3547 Cedar Ave. South
Minneapolis, MN 55407
(612) 659-9019
(612) 436-3664 – Facsimile

**ATTORNEY FOR ABDIRAHMAN DAUD**