UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

UNITED STATES OF AMERICA,

           Plaintiff,

v.                        **SENTENCING MEMORANDUM**
                               **AND OPINION**
                          Criminal File No. 15-49 (04) (MJD/FLN)

ABDIRAHMAN YASIN DAUD,

           Defendant.

_____

John Docherty, Andrew Winter and Julie Allyn, Assistant United States
Attorneys, Counsel for Plaintiff.

Bruce D. Nestor, De Leon & Nestor, LLC, Counsel for Defendant.

_____

## I.    SUMMARY OF SENTENCING DECISION

Following a jury trial, the Defendant was found guilty on the following

counts in the Second Superseding Indictment: Count 1, Conspiracy to Commit

Murder Outside the United States in violation of 18 U.S.C. §§ 956(a) and (2);

Count 2, Conspiracy to Provide Material Support to a Designated Terrorist

Organization in violation of 18 U.S.C. § 2339B(a)(1); and Count 6, Attempting to

Provide Material Support to a Designated Foreign Terrorist Organization in

violation of 18 U.S.C. §§ 2339B(a)(1) and 2.

When imposing a sentence in any criminal case, this Court must take into consideration the applicable guideline range calculated pursuant to the United States Sentencing Guidelines ("USSG") and the statutory sentencing factors set forth in Title 18 U.S.C. § 3553(a).

The Court has carefully considered all of these factors and finds that a variance from the applicable sentencing guideline range of life in prison is warranted. Accordingly, the Court finds that a sentence of three hundred-sixty (360) months is sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in both § 3553(a) and the relevant guidelines.

## II.   INTRODUCTION

Crimes that involve acts of terrorism "represent[] a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal [] thus [] terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003).

In 2014, the Defendant agreed to conspire with others to join one of the most dangerous and violent terrorist organizations the world has ever known,

the Islamic State of Iraq and the Levant ("ISIL").  By joining this conspiracy, the

Defendant agreed to be part of the largest group of committed ISIL travelers from

Minnesota; an ISIL terrorist cell that, left unchecked, could have caused immense

destruction and the loss of many lives, both here and abroad.

As part of this cell, the Defendant watched some of the horrific

propaganda videos produced by ISIL.  These videos depict ISIL members killing

innocent victims in the most violent and despicable manner, such as mass

beheadings, shootings and in one case, a Jordanian pilot that was burned alive.

Each member of the conspiracy took affirmative steps to travel overseas to

join and fight with ISIL.  Some of the conspirators successfully traveled to Syria

and joined ISIL; most of whom have since been killed.

The evidence at trial clearly demonstrated that each member of the

conspiracy knew that what they were doing was wrong.  To avoid the scrutiny of

their families, friends and most importantly, law enforcement, they followed the

ISIL playbook, which counseled "fake it till you make it."  This strategy required

the conspirators to remain under the radar by going to school, working to

provide financial assistance to their families, attending the Mosque, and

remaining otherwise law-abiding.  This strategy also provided that if confronted

by law enforcement, they should loudly complain that they were being profiled because they were Muslim.  In order to carry out this strategy, however, the conspirators had to lie to their parents and family, to the FBI agents investigating this case, to the grand jury and to the prosecutors.

The members of the conspiracy were deeply committed to the violent jihadist ideology of ISIL.  Because of this commitment, they were **not** deterred when subpoenaed to testify before the grand jury or when they received a target letter[1] from the United States Attorney's Office.  Members were **not** deterred when physically prevented from boarding flights here in Minneapolis or in New York City in their effort to join ISIL in Syria.  They were **not** deterred when confronted by their parents, grandparents or siblings.

Despite all of the obstacles put in their way, the members of this conspiracy continued the march toward their admitted objective; to be a committed jihadi warrior, and to travel to Syria to fight, kill and become a martyr.

III.    FINDINGS OF FACT

---

[1]A target letter is sent from the United States Attorney's Office informing the recipient that he/she is a target of a federal criminal investigation.

The Court adopts the factual statements contained in the presentence report ("PSR") as its findings of fact.  In addition, the Court adopts those facts set forth in Common Appendix A to the Government's Position on Sentencing [Doc. No. 726] and attached hereto as Common Appendix A.

In addition, the Court takes into consideration all of the evidence introduced at trial[2] when imposing sentence.

## IV.    APPLICATION OF THE GUIDELINES

The Court found the applicable guideline range was based on a total offense level of 43 and a criminal history category VI, which results in a guideline range of life in prison.

### A.    Acceptance of Responsibility

Despite the fact that he is not seeking acceptance of responsibility, the Defendant objects to paragraph 152 of the PSR to the extent it asserts that he denies providing ISIL contact information to Abdullahi Yusuf and denies maintaining contact with co-defendants.  The Court finds it need not rule on this objection, as it does not affect the guideline calculations.

---

[2]The trial took place over nineteen days, during which 26 witnesses testified for the government, 1 witness for the defense and over 300 exhibits were admitted into evidence.

5

B.      Terrorism Enhancement

The Defendant objects to the application of the 12 level enhancement pursuant to § 3A1.4. Section 3A1.4 (a) provides for a twelve level enhancement for crimes that involved, or were intended to promote, a federal crime of terrorism. A federal crime of terrorism is defined as conduct that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a crime enumerated in 18 U.S.C. § 2332b(g)(5), which list includes 18 U.S.C. §§ 956 and 2339B(a)(1). See Section 3A1.4, Application Note 1.

There can be no dispute that the crimes for which the Defendant was convicted are specified in § 2332b(g)(5). The next inquiry is whether the crimes of conviction were calculated to influence, affect or retaliate against a government. "Many courts . . . interpret 'calculated' as nearly synonymous with intentional. Thus, 'if a defendant's purpose in committing an offense is to 'influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' application of the terrorism enhancement is warranted." United States v. Siddiqui, 699 F.3d 690, 709 (2d Cir. 2012).

The Defendant argues insufficient evidence was presented at trial to

6

conclude he had the specific intent to commit a federal crime of terrorism "calculated to influence or affect the conduct of government by intimidation or coercion." Instead, the evidence only showed he and a handful of young men conspired to join and fight with ISIL, and that they had no military training or access to weapons for fighting. At best, such evidence had a marginal effect upon the ability of ISIL to carry out acts of terrorism.

The Court finds this argument has no merit, as it is not necessary that the Defendant was motivated to retaliate, influence or affect the conduct of a government. It is sufficient if there is evidence that the Defendant "intended to promote a crime calculated to have such an effect, i.e., that his offenses were intended to promote a federal crime of terrorism as defined in § 2332b(g)(5), whatever [the defendant's] reason for committing them." United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010); see also United States v. Ali, 799 F.3d 1008, 1031 (8th Cir. 2015) (whether terrorism enhancement applies depends on whether offense of conviction was calculated to influence or affect the conduct of government by intimidation, not on the defendant's motive for committing the offense); United States v. Jayyousi, 657 F.3d 1085, 1115 (11th Cir. 2011) (finding that "the Guidelines's precise language focuses on the intended outcome of the

defendants' unlawful acts—i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was.").

To determine whether the Defendant intended to promote a crime calculated to influence, affect or retaliate against a government, the Court may draw reasonable inferences regarding the defendant's intent in committing the crimes of conviction based on the evidence. United States v. Mohammed, 693 F.3d 192, 201-02 (D.C. Cir. 2012). In fact, application of a particular guideline must be determined based on all acts committed by the Defendant and his co-conspirators that were in furtherance of the conspiracy. Section 1B1.3(a) and (b).

In this case, the evidence clearly demonstrated that the Defendant intended to join and fight with ISIL, and that members of ISIL had repeatedly called for attacks against the United States and other Western countries. The provision of material support to ISIL, the crime for which the Defendant was convicted, would clearly promote ISIL's purposes of committing terrorist attacks here and abroad.

The Defendant further argues that as the conflict in Syria involves a complex and entangled group of various governments, armed groups representing various sectors of the population and multiple organizations, there

8

is simply no basis in the current version of the offense conduct to establish that

the Defendant had the intent to commit an offense calculated to affect the

conduct of any particular government.  The government of Bashar al-Assad is not

the recognized government in Syria.  Instead, the recognized legitimate

government in Syria is the Syrian National Council.

The Defendant further argues the expert testimony at trial established that

the United States government has funded, armed and trained rebel forces in Syria

with the purpose of overthrowing the regime, which violates international law,

citing in support The Republic of Nicaragua v. United States, Int'l Court of

Justice, ICJ Rep. 14 (27 June 1986) (one state may not use force against the

recognized government of another state).  Such force can only be justified as self

defense against an armed attack.  If the al-Assad regime is the legitimate

government of Syria, then this is tantamount to a judicial finding that the United

States has violated international law by funding, arming and training military

unites to kill members of the recognized armed forces of Syria.

With respect to the "government" element of this enhancement, the Court

finds it is not necessary that the federal crime of terrorism affected the conduct of

the United States or was meant to retaliate against the United States.  For

example, in United States v. Awan the Second Circuit found the enhancement applicable where the crimes of conviction involved conspiracies under §§ 946 and 2339A, and the unlawful activity was directed toward the Indian government. 607 F.3d at 306; see also United States v. Assi, 428 Fed. Appx. 570 (6th Cir. 2011) (finding that "the term 'government' in 18 U.S.C. § 2332b(g)(5) includes foreign governments and therefore is not limited to acts against the United States."); United States v. Puerta, 249 Fed. Appx. 359, 360 (5th Cir. 2007) (applying terrorism enhancement in case involving conspiracy to provide material support to a foreign terrorist organization that opposed the Colombian government).

In addition, it is not necessary that the Court make findings as to the legitimacy of the government affected or retaliated against.  In Assi, the Sixth Circuit rejected the defendant's argument as to the legitimacy of the Israeli government.  In doing so, the court held that "Congress did not intend for a United States district court judge to determine whether a foreign state is complying in full with its international obligations before determining whether a person who has [been convicted of a crime] providing support to a foreign terrorist organization is subject to § 3A1.4." Id. 428 Fed. Appx. at 575.

Based on the evidence in the record, the Court finds that the terrorism

10

enhancement clearly applies in this case.  Overwhelming evidence was presented

at trial, including the expert testimony of Charles Lister, ISIL propaganda videos,

social media content from the co-conspirators, as well as the Defendant's own

statements, that showed the Defendant's actions involved or were intended to

promote crimes that were calculated to influence or affect the conduct of

government or to retaliate against these governments.

### C.        Downward Departure Based on Criminal History Category

In the event the Court finds the terrorism enhancement applies, the

Defendant contends that a downward departure as to criminal history is

warranted.  He points out that he has no prior criminal history, and that reliable

evidence demonstrates that he does not have a propensity to commit acts of

violence.  In addition, he has expressed genuine remorse and he possesses

vocational and educational abilities which would allow him to succeed in the

community.  He further argues that not all federal crimes of terrorism are equally

serious with regard to criminal intent, the injury inflicted on others or the harm

caused to the community, yet § 3A1.4 treats all persons convicted of terrorism

crimes the same, irregardless of the criminal conduct involved.  The Defendant

notes that a number of district courts have found that the automatic application

of a criminal history category VI arising from § 3A1.4 is an over-representation of the defendant's criminal history or the likelihood the defendant would reoffend. See, e.g., United States v. Benkahla, 501 F. Supp.2d 748, 759 (E.D. Va. 2007) aff'd 530 F.3d 300 (4th Cir. 2008); United States v. Aref, No. 04-CR-402, 2007 WL 804814 (N.D.N.Y. Mar. 14 , 2007).

The Court recognizes that it has the discretion to depart downward under § 4A1.3 if it finds that the terrorism enhancement over-represents the seriousness of the Defendant's past criminal conduct or the likelihood he would reoffend. The Court declines to exercise that discretion in this case, given the nature of the offenses of conviction, which involved attempts to travel overseas to join and fight with ISIL, one of the most dangerous and violent terrorist organizations the world has ever known.  See Meskini, 319 F.3d at 92 (recognizing that "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation and the need for incapacitation.")

Accordingly, the Court will deny the Defendant's motion to depart downward based on overstatement of criminal history.

**V.    SENTENCE**

12

The Defendant is hereby sentenced to a term of imprisonment for three hundred-sixty (360) months: three hundred-sixty (360) months on Count 1; and one hundred-eighty (180) months on Counts 2 and 6, all terms of imprisonment to be served concurrently. Following his term of imprisonment, the Defendant is subject to a life term of supervised release on Counts 1, 2 and 6, all terms of supervised release to run concurrently. Based on the Defendant's current economic condition, the Court did not impose a fine, but did impose a special assessment in the amount of $300.

## VI.   STATEMENT OF REASONS

Pursuant to the Supreme Court decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), the United States Sentencing Guidelines are no longer mandatory. The Court is nonetheless required to take into account the applicable Guideline range and the pertinent Sentencing Commission policy statements. In addition, the Court must impose a sentence sufficient, but not greater than necessary, to comply with the following sentencing purposes:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

13

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

The Court also considers the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

**A.     Section 3553(a) Factors**

**1.     Nature and Circumstances of the Offense**

The Defendant was involved throughout the entire duration of the charged conspiracy.  After Hanad Mohallim departed in March 2014, the co-conspirators met at this Defendant's house to discuss Mohallim's departure.  When Abdullahi Yusuf joined the conspiracy shortly thereafter, the Defendant recommended Yusuf watch ISIL propaganda videos.  The Defendant was also present in a warehouse in San Diego, California, trying to purchase fraudulent passports so he could fly overseas to join ISIL in April 2015.

14

The Defendant argues that he never had a leadership role among his co-conspirators and made no public statements promoting ISIL.  He further asserts he lacked training, military skills or familiarity with weapons, and that his desire to travel to Syria waxed and waned over time.  He also asserts he is a religious man, and the lack of English speaking and culturally American religious mentors led him to be attracted to the on-line mentors who promoted intolerance and violence as a means of responding to actual suffering outside the United States.  His desire to help others experiencing great suffering was intertwined with the plans to join and fight with ISIL.

The evidence at trial, however, portrayed someone that was committed to the plan to join and fight with ISIL during the charged conspiracy.  It was this Defendant that suggested using encrypted messaging applications to avoid the attention of law enforcement.  He participated in multiple meetings to plan travel for co-conspirators.  Prior to Abdullahi Yusuf's attempt to travel in May 2014, this Defendant provided Yusuf crucial phone numbers for ISIL operatives who would ensure his passage to Syria.  Although Yusuf was ultimately prevented from flying overseas, co-conspirator Abdi Nur successfully departed for Syria.  The Defendant kept in contact with Nur while he was alive in Syria.

15

In addition to assisting in the travel plans of his co-conspirators, in April 2014, the Defendant applied for expedited refugee travel documents for his own travel. His application languished, however, so while others were making concrete plans to travel, the Defendant did not have valid travel documents. The lack of travel documents did not deter him from achieving his goal of joining and fighting with ISIL.

In the summer of 2014, the Defendant watched and discussed the horrific ISIL propaganda videos which depicted ISIL members committing mass murders and torture of innocent victims. On occasion, this was done while at work at a mail and packaging facility. The Defendant also participated in paint ball sessions that were intended to train him for combat with ISIL.

When the co-conspirators learned in October 2014 that Yusuf would likely be arrested for his attempt to fly to Turkey in May, the Defendant emerged as a leader and organizer of the next attempt to travel. He was specifically involved in preparations for the November 2014 travel attempt by Mohamed Farah, Hamza Ahmed, Hanad Musse and Zacharia Abdurahman by determining the timing of the trip and by providing some of the funds for travel. The Defendant further claimed to have the necessary ISIL contact for the group when they

16

reached Turkey.  Guled Omar specifically blamed the failure in November on the Defendant, claiming that the Defendant rushed them.

In January 2015, the Defendant was subpoenaed to testify before the grand jury.  He falsely testified that he did not talk with Mohamed Farah about traveling to Syria, and that he did not know what Farah's or Musse's travel plans were.

During the early part of 2015, the Defendant also continued planning ways in which he could travel overseas.  He was interested in obtaining a false passport, as he did not have any legitimate travel documents.  On a recording made by the confidential human source, Abdirahman Bashir, the Defendant can be heard discussing the perfect time to travel.  He also provided a photograph for use in a fraudulent passport.  In other recordings, the Defendant is heard discussing the fact that they had to "act normal" so as not to raise any suspicions and admitting that using a fake passport was against the law, and that he didn't care if he went to jail.

Before leaving for California in April 2015, the Defendant communicated with an ISIL fighter about travel arrangements after they arrived in Syria.  He also planned to sell his car once in California to finance the trip.  During the

17

drive, he stated "I'm going to spit on America, [I swear], at the border crossing. [May Allah's curse be upon you.] . . . I don't think I can sleep until I see the flags . . . when I get picked up, I'm a tell the brother, Can I get an AK real quick?  Can I borrow your AK five seconds?  I'm a shoot the lights of out that thing bro. [I swear]  I'm going to shoot it in the air . . . all the Shias, [I'm going to call, I swear] . . All three of us are going to get shahada [martyrdom] before we even go to training camp. . . "

## 2.   History and Characteristics of the Defendant

The Defendant came to the United States when he was nine years old.  He was first raised by his grand-parents, but he was reunited with his parents when he was 13 years old.  He is the oldest of five children, and was a father figure to his younger siblings.  After graduating from high school, he took some college courses, and worked as a driver for a daycare center.

The Defendant asserts he was drawn into an extremist ideology when he was 17 years old, and he was only 20 years old when Hanad Mohallim departed to Syria.  Although he was not a juvenile at that time, he argues that his brain had not yet reached its ultimate state of development, and that the zealousness of youth contributed to his actions in this case.

He also asserts that he felt he had two lives; one in the United States and one life abroad "in a utopia where he could be accepted."  (PSR ¶ 202.)  As argued in the Defendants' Joint Memorandum, young Somalis who come of age while experiencing identity confusion are particularly vulnerable to extremist recruiters.  Outside the evidence that he experienced an increased attraction to extremist ideology, he was a peaceful and respectful person in his daily life. Friends and family describe him as supportive and committed.

The Court finds, however, that despite his strong, supportive family and steady employment, the Defendant chose to become a terrorist.  The evidence at trial demonstrated that the Defendant did more than listen to radical jihadists; he took steps to assist his travel and the travel of others so they could join and fight with ISIL.

The Defendant lied to the grand jury about the group's plots to join ISIL and later mocked the process when talking amongst his co-conspirators.  He continued to mock the process by submitting a letter to the probation office stating he was only concerned with defending his fellow Muslims, that he was incapable of violence, that it was difficult for him to criticize his co-conspirators' plans and he was manipulated by them.  The evidence at trial clearly contradicts

19

these statements, in particular the recordings which include the Defendant

making numerous statements in favor of jihad - but none of which depict the

Defendant making statements about helping Syrians or alleviating their

suffering.

There are also a number of recorded conversations in which the Defendant

can be heard praising an ISIL video in which young children are given weapons

by their fathers to kill the "kuffar."  In other recordings, he expressed a

willingness to conduct violence in the United States if the "emir" sends him back

or to help other ISIL fighters do so.  As such, the Court categorically rejects his

claim that he only sought to provide humanitarian aid.  No reasonable person

would believe that ISIL was an organization involved in charity, the protection of

innocent Syrians or the pursuit of fair government because no evidence was

submitted to support such a contention.

To the contrary, the government's expert, Charles Lister, testified that al

Qaeda separated from ISIL in 2014 because of the sheer brutality of ISIL's blood

lust.  Further, ISIL distributed and publicized a number of videos showing the

beheading of hostages, the shooting of innocent civilians and the burning of a

Jordanian pilot.  These videos dispel any notion that ISIL was a "charitable"

20

organization.

In addition, to the extent that the Defendant argues his young age is a mitigating factor to be considered when imposing sentence, the Court rejects such argument.

In <u>Miller v. Alabama</u>, the United States Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." <u>Id.</u>, 132 S. Ct. 2455, 2469 (2012). The Court found that a mandatory sentencing scheme of life in prison was unconstitutional because it did not allow the sentencing court to consider that children are constitutionally different from adults for purposes of sentencing. "Because juveniles have diminished culpability and greater prospects for reform, we explained 'they are less deserving of the most severe punishments.'" <u>Id.</u>, at 2464 (citations omitted). In reaching this conclusion, the Court also recognized that children "lack [] maturity and [have] an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; are more susceptible to peer pressure and have a limited control over their own environment; and their character is not well-formed and their "actions [are] less likely to be evidence of irretrievable depravity." <u>Id.</u>

Because of these attributes, the Court held that "the penological justifications for imposing the harshest sentence" on juveniles are diminished, "even when they commit terrible crimes." Id. at 2465.

This Court has previously addressed the issue of youth as a factor in sentencing in United States v. Robert James Jefferson. In that case, the Court re-sentenced the defendant who had previously been sentenced to a mandatory life term of imprisonment for murders committed when he was sixteen years old, pursuant to the Miller decision. Applying the principles set forth in Miller, and specifically as to whether the crimes of conviction involved reckless or impulsive behavior due to a lack of maturity in the Jefferson case, this Court found that

> [w]hile the criminal conduct at issue here is certainly reckless, the Court finds that such criminal conduct did not involve rash or impulsive behavior. The fire bombing of the Coppage home involved planning, the creation of molotov cocktails and then waiting until dark to set the house on fire. Jefferson had plenty of time to consider what he was doing and the consequences of starting a home on fire. He had plenty of time to back out of the plan, but he did not do so.

United States v. Jefferson, No. 97-276, 2015 WL 501968, at * 5 (D. Minn. Feb. 5, 2015).

Applying the principles set forth in Miller in this case, the Court finds that the record does not support a downward variance from the applicable guideline

range based on his young age.  First, the Defendant was not a juvenile when he

committed the instant offense.  Second, there is nothing impulsive about the

crimes of conviction.  The Defendant enthusiastically participated in a conspiracy

that took place over the course of one year.  The evidence at trial showed that the

Defendant had multiple opportunities to walk away from this conspiracy, but he

did not do so.  He knew what he was doing was illegal, but he chose to continue

his participation in the conspiracy until the day he was arrested.

### 3.    Seriousness of the Offense, Respect for the Law and Just Punishment, Deterrence and Protection of the Public

The atrocities committed by members of ISIL are well-known, and were

known to this Defendant when he made the decision to join ISIL in Syria.  The

fact that the Defendant took affirmative steps to join ISIL is of paramount concern

given that four men have died in Syria as a result of this conspiracy: Douglas

McCain, Abdi Nur, Yusuf Jama and Hanad Mohallim.

The Defendant now stands convicted of serious offenses, and respect for

the law and providing just punishment warrant a significant punishment. A

significant sentence is also needed for individual deterrence, given the

Defendant's persistent and long-lasting role in the conspiracy.  A thirty year

sentence is justified to protect the public from Defendant's deeply held desire to become an ISIL fighter and will deter others from committing similar crimes.

### 4.       Unwarranted Sentencing Disparities

The government has filed reports on national terrorism sentencings that summarizes sentencing data from cases around the country in which one or more defendants have been convicted of providing, or conspiring to provide, material support and resources to the Islamic State in Iraq and the Levant ("ISIL").

The report includes information on 26 defendants.  Of these, four defendants were convicted by a jury.

### a.       United States v. Sohiel Kabir and Ralph DeLeon, (C.D. Cal. 12-92 VAP)

After a six and-a-half week trial, Kabir and DeLeon were convicted of multiple counts conspiracy to provide material support to terrorists, in violation of 18 U.S.C. § 2339A, conspiracy under 18 U.S.C. § 371 and conspiracy to kill officers and employees of the United States in violation of 18 U.S.C. § 1117.

Kabir was sentenced to 300 months on the conviction of conspiracy to kill officers and employees of the United States;  180 months on the material support convictions, and 60 months on the conspiracy charge, all terms to be served

24

concurrently.  DeLeon was also sentenced to 300 months on two conspiracy to murder charges, and 180 months on the material support counts, all terms to be served concurrently.

> **b.** <u>**United States v. Nader Salem Elhuzayel and Muhanad Elfaith M.A. Badawi**</u>  **(C.D. Cal. 15-60)**

The defendants in this case, Elhuzayel and Badawi, used social media to discuss ISIL and terrorist attacks, expressed a desire to die as martyrs and made arrangements for Elhuzayel to leave the United States.  Elhuzayel also had contact with ISIL operatives and supporters, including Elton Simpson, one of the perpetrators of the May 2015 attack in Garland, Texas.  The two defendants also carried out a significant bank fraud to raise travel funds.  Both defendants were sentenced to thirty years in prison.

The Defendant asks the Court to consider the sentence imposed in <u>United States v. Mahamud Said Omar</u> (09-cr-242 D. Minn.)  Omar was convicted of one count under § 2339A and one count under § 956, and this Court sentenced him to 240 months.

The Defendant also cites to <u>United States v. Shelton Bell</u>, 13-141 (M.D. Fla.), where the district court sentenced Bell to 240 months in prison after he plead

guilty to two counts under § 2339A.

Finally, the Defendant cites <u>United States v. Agron Hasbajrami</u>, (E.D.N.Y.
11-623).  In that case, Hasbajrami was sentenced to 192 months after pleading
guilty to two counts under § 2339A.

To avoid sentencing disparities, the Court is to consider defendants with
similar records who have been found guilty of similar criminal conduct.  Because
the Defendant went to trial, the Court will consider only those cases that are
similar to this Defendant.

Based on the data as to defendants convicted of similar offenses to those in
this case and the Defendant's history and characteristics, the Court finds that a
sentence of thirty years avoids unwarranted sentencing disparities.

### 5. To Provide Needed Educational/Vocational Training, Medical Care or other Correctional Treatment in the Most Effective Manner

Because of the risks of re-radicalization for defendants convicted of
terrorism offenses, and the fact that no program exists, either within or outside of
the federal prison system, that meets the standards of a qualified disengagement

and deradicalization program[3], the Court finds this factor does not support a

more substantial variance from the applicable guideline range.

### 6.      Conclusion

Taking into account all of the above, the Court finds that a sentence of

three hundred-sixty (360) months is sufficient, but not greater than necessary, to

comply with the sentencing purposes set forth in both § 3553(a) and the relevant

guidelines.

Date: December 5, 2016


                              s/Michael J. Davis
                              Michael J. Davis
                              United States District Court

---

[3]The Court appointed Daniel Koehler, Director of the German Institute on Radicalization and De-radicalization Studies, to conduct a risk assessment evaluation and recommendations as to intervention needs for de-radicalization for the co-defendants who entered into Plea Agreements in this and related cases.  In addition to submitting reports to the Court, Koehler testified during a two day hearing and was subjected to cross examination by the Court, the government and the defense.  Koehler has extensive experience working with individuals involved with terror groups, including Somali jihadists and violent neo-nazi extremists.  He has counseled approximately 200 cases in the last six years, and is working to develop programs for the successful de-radicalization of those involved in terrorism related cases.  Koehler has suggested that such a program should involve expert personnel in the areas of religion, psychology, education and socialization.